QUINCY OIL, INC., Plaintiff,

v.

**FEDERAL ENERGY
ADMINISTRATION,**
Defendant.

Civ. A. No. 76–4096–C.

United States District Court,
D. Massachusetts.

April 2, 1979.

Timothy H. Gailey, Hale & Dorr, David S. Mortensen, Boston, Mass., for plaintiff.

Cynthia S. Bogorad, Bonnie S. Blair, Spiegel & McDiarmid, Washington, D. C., Edward A. Roster, Roster & Antine, Taunton, Mass., for intervenor, Taunton Municipal Lighting Plant.

Carolyn Grace, Asst. U. S. Atty., Boston, Mass., Mark J. Kreitman, Ellen P. Spangler, U. S. Dept. of Energy, Regulatory Litigation Div., Washington, D. C., for defendant.

## OPINION

CAFFREY, Chief Judge.

This is a civil action for declaratory judgment and injunctive relief brought by Quincy Oil, Inc. (Quincy) against the Federal Energy Administration (FEA), now the Department of Energy (DOE). Plaintiff, Quincy, seeks judicial review of orders of the DOE. The agency found that Quincy

had violated the mandatory Petroleum Price Regulations with respect to sales of No. 6 fuel oil by Quincy to Taunton Municipal Lighting Plant (Taunton) during the period November 1, 1973 through May 31, 1976[1] and ordered Quincy to refund approximately $400,000 in overcharges. It denied exceptional relief from that finding. Quincy also challenges the validity of FEA Ruling 1977–5 which DOE relied on in its final Order and Decision of March 31, 1977. The parties filed certain discovery motions which were referred to the magistrate.

The matter is now before the Court on DOE's appeal from a portion of the discovery order issued by the magistrate on October 23, 1978. The magistrate denied DOE's request for a protective order and allowed Quincy to depose the decisionmaker who issued the notice of probable violation (NOPV) which lead to the administrative order which found Quincy in violation of the petroleum price regulations. The magistrate ordered DOE to file forthwith the complete administrative record. He also allowed Quincy's request for production of documents generated during the investigative stage of the proceedings but denied Quincy's request for unofficial agency statements.

The case filed is burdened with several memoranda submitted by each of the parties. After hearing, I now affirm in part and reverse in part the magistrate's order.

An explication of the applicable regulatory law, factual background and administrative proceedings to date assists the Court in determining the scope of discovery, if any, to be ordered.

Pursuant to the authority of the Economic Stabilization Act of 1970 (ESA), 12 U.S.C.A. § 1904, and the Emergency Petroleum Allocation Act of 1973 (EPAA), 15 U.S.C.A. § 751 *et seq.,* the FEA promulgated regulations establishing the maximum allowable price which a reseller of refined petroleum products may charge. The basic rule, subject to exceptions not here relevant, is that:

A seller may not charge a price for any item subject to this subpart which exceeds the weighted average price at which the item was lawfully priced by the seller in *transactions* with the class of purchaser concerned on May 15, 1973, plus an amount which reflects on a dollar-for-dollar basis, increased costs on the item.

10 C.F.R. § 212.93(a) (emphasis added). The term "transaction" is defined in the regulations as occurring "at the time and place when a binding contract is entered into between the parties," 10 C.F.R. § 212.-31, a definition originally adopted in 1973 by the Cost of Living Council (CLC) and later adopted by the FEA. *Gulf Oil Corp. v. Schlesinger,* 465 F.Supp. 913 (1979).

In March, 1977 the FEA issued Ruling 1977–5 purporting to clarify the proper meaning and application of the definition of transaction. The Ruling provides that, when a contract has a variable price term:

[T]hat such a . . . contract is merely a general sales agreement which, because of its lack of a fixed price that would reflect market level prices on the date the contract was entered into, cannot be regarded as a "binding contract" for purposes of the definition of "transaction" and the computation of May 15, 1973, selling prices. Within the framework of such a general sales agreement, one or more subsidiary contracts occur, and they are presumed to have been entered into on the date the price becomes fixed with respect to a particular delivery. At that time a fixed price is specified with respect to a particular delivery pursuant to the terms of a general sales contract, a "binding contract" arises for purposes of the definition of "transaction."

42 Fed.Reg. 15306.

In April, 1972, Quincy entered into a variable-price contract to supply No. 6 fuel oil to Taunton for a one-year period which extended from May 1, 1972 through April 30, 1973. The contract contained a clause which conferred authority on Taunton uni-

1. Residual fuel oil became exempt from FEA price controls on June 1, 1976.

laterally to extend the supply contract for an additional 90 days beyond April 30, 1973 at the same price. On April 23, 1973, Quincy and Taunton entered into another variable-price contract in which Quincy agreed to supply No. 6 fuel oil to Taunton for the period May 1, 1973 through April 20, 1974. Taunton exercised its 90-day option under the April, 1972 contract, and Quincy continued to make deliveries at prices established under the terms of the old contract until July 31, 1973. Deliveries under the new contract did not commence until August 1, 1973.

On January 13, 1976, after an audit of Quincy's books and records, the FEA issued a NOPV to Quincy, which alleged that Quincy violated the price regulations in its sales to Taunton by calculating its May 15, 1973 selling price under its new contract, which the FEA claimed did not take effect until August 1, 1973. The NOPV stated that the maximum allowable selling price was to be determined on the basis of the price at which Quincy charged Taunton in transactions on May 15, 1973.

On May 15, 1976, Quincy submitted a formal reply to NOPV setting forth its contention that a "transaction" between Quincy and Taunton took place on April 23, 1973, when the parties signed the new contract and that the maximum allowable price should be computed by reference to that contract.

On November 2, 1976, DOE issued a Remedial Order (RO) which concluded that Quincy had in fact violated the petroleum price regulations. The RO discussed Quincy's submissions, the history and intent of the regulatory pricing rules, the definition of "transaction," the application of the regulations and definitions to the Quincy-Taunton facts, and set forth in an attachment the computations used to calculate the amount of overcharges which Quincy would be required to repay to Taunton. The RO concluded that the price at which Quincy delivered fuel oil to Taunton on May 15, 1973 was the base price which Quincy was required to use in determining its maximum allowable selling price for the purposes of the FEA price regulations.

Quincy appealed the RO to the Office of Exceptions and Appeals of the FEA on November 11, 1976, contending that the RO was contrary to the plain meaning of the FEA's regulations and that it was arbitrary and capricious and an abuse of discretion. In addition, Quincy contended that the RO was an unlawful confiscation of Quincy's property in violation of the Constitution. This appeal was denied by Decision and Order of March 31, 1977 in a thirteen-page opinion which agreed with the conclusion reached in the RO but applied Ruling 1977–5, which defines "transaction" in a manner different from that in the RO. The opinion ordered Quincy to refund the overcharges to Taunton. This is the first of the two orders challenged by Quincy in this action.

Parallel to the above proceeding, there was a proceeding for prospective and retroactive exception relief from the NOPV. Quincy applied, pursuant to 10 C.F.R. ¶ 205.50, on January 16, 1976, for exception relief from the NOPV, contending that strict application of the regulations as interpreted by FEA would cause severe hardship and gross inequity. The FEA denied Quincy's application for exception on May 7, 1976. Thereafter, Quincy filed an administrative appeal which the FEA denied by Decision and Order of November 8, 1976.

In April, 1977, Quincy filed a further application for exception relief based on the invitation contained in FEA Ruling 1977–5. On November 23, 1977, FEA dismissed Quincy's application for exception, without prejudice for resubmission at a later date, concluding that Quincy had failed to furnish financial and operating data necessary to a determination of Quincy's appeal. This is the second order from which Quincy appeals. Apparently, Quincy has submitted additional financial data for DOE to rule upon Quincy's exception application which is now pending before DOE.

On November 18, 1976, Quincy filed this action alleging that the challenged orders are arbitrary, capricious and contrary to law and not supported by substantial evidence on the record. On April 26, 1977,

Quincy filed an amended complaint to include a challenge to Ruling 1977–5.[2] Quincy seeks a declaration that the prices charged Taunton during the period of price control were in compliance with the price regulations.

On March 6, 1978, DOE filed the administrative record, totalling approximately 600 pages. Also on that date, the parties filed cross-motions for summary judgment.

On April 23, 1978, Quincy moved to compel production of documents, including documents relating to DOE's audit of Quincy on which the RO was purportedly based, documents prepared by DOE relating to sales by Quincy of No. 6 fuel oil, the DOE auditor's report, and documents relating to the various decisions, orders and appeals in this case. In addition, Quincy sought documents instructing auditors as to the rules applicable in situations comparable to Quincy's and documents discussing when a transaction is deemed to occur under DOE regulations.

On April 28, 1976, Quincy noticed the deposition of John V. Balutis, who issued the NOPV.

Thereafter, Quincy moved to compel DOE to assemble a complete administrative record, claiming the record as filed lacked numerous documents in the administrative proceedings.

DOE has moved for a protective order, claiming that the information sought was irrelevant and privileged. DOE seeks to stay discovery, including the noticed deposition, until the pending motions for summary judgment can be heard. DOE has maintained throughout that discovery is inappropriate since the complete administrative record is before the Court.

In ruling on these discovery matters, this Court must remain cognizant of the scope of its review of the case on the merits and determine whether the materials sought are relevant to any of the issues contested by the parties. Thus, this Court must look at the appropriate scope of such judicial review before it can decide the propriety of the discovery requests. See Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 413, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971); A. O. Smith v. Federal Trade Commission, 403 F.Supp. 1000, 1004–05 (D.Del.1975).

The appropriate scope of review for this Court is delineated in the Economic Stabilization Act of 1970, Pub.L. 91–379, § 211 (codified at 12 U.S.C. § 1904 note), incorporated into Emergency Petroleum Allocation Act of 1973, 15 U.S.C.A. § 754(a)(1), which provides in part:

[N]o order of such agency shall be adjoined or set aside, in whole or in part, unless a final judgment determines that such order is in excess of the agency's authority, or is based upon findings which are not supported by substantial evidence.

The law is well-settled that judicial review must be based on the full administrative record that was before the decisionmaker at the time he made his decision and not on a de novo review of the facts in the District Court. E. g., Citizens to Preserve Overton Park, Inc. v. Volpe, supra, 401 U.S. at 420, 91 S.Ct. 814.

Preliminary to a consideration of what constitutes the full administrative record, I note that Quincy complains that confidential financial information used by DOE in its computation of the alleged amount of pricing overcharges has been deleted from the administrative record. After this Court issued a protective order concerning that financial information, DOE agreed to produce it.

Despite resolution of that issue, the parties still differ as to whether the full record is before the Court. Quincy contends that the administrative record should

---

**2.** Ruling 1977–5 is the subject of pending litigation in at least two other districts. It is presently the subject of four actions in the Northern District of Texas, *Coastal States Gas Corporation v. FEA and O'Leary,* (C.A. 77–626); *General Crude Oil Co. v. FEA, et al.,* (C.A. 77–1253); *Exxon Corp. v. White, et al.,* (C.A. 3–77–1158); *Mobil Oil Corp. v. DOE,* (C.A. 3–77–1466 D), and one in the Eastern District of Pennsylvania, *Gulf Oil Corp. v. O'Leary,* (C.A. 77–3113).

include all information submitted to DOE in the administrative proceedings. DOE counters that the relevant record for the purposes of judicial review should consist only of the information which the decisionmaker of the final order had before him. DOE contends the record should not include what was before other agency officials who made earlier, non-final decisions in the administrative process.

The regulatory scheme, not challenged herein, provides that a remedial order is only an intermediate agency action, 10 C.F.R. § 205.195, one not subject to judicial review, but one which could be appealed through the applicable administrative procedures. 10 C.F.R. §§ 205.196, 205.100, 205.-108. From that order a person "may file an appeal with the FEA Office of Exceptions and Appeals or with the appropriate Regional Office in accordance with subpart H of this part." 10 C.F.R. § 205.196. Similarly, a denial of an application for exemption is only an intermediate agency action, one not subject to judicial review "until an appeal has been filed pursuant to Subpart H and the appellate proceeding is completed by the issuance of an order granting or denying the appeal." 10 C.F.R. § 205.78. Subpart H authorizes the FEA in its appeal process to conduct what appears to be a *de novo* review. 10 C.F.R. § 205.106(a). The regulations further provide that a decision and order issued as the result of an appeal is a final order from which one may seek judicial review. 10 C.F.R. § 205.106.

With this regulatory scheme in mind, I conclude that the March 31, 1977 Decision and Order denying Quincy's appeal of the RO and the order denying Quincy's appeal from the denial of its application for exception relief are the final DOE orders from which Quincy now seeks judicial review. *Getty Oil Co. v. DOE*, No. 77–434 (D.Del. May 4, 1978). It follows, therefore, that the full administrative record includes that information which was before the decisionmaker who issued the final orders and decisions now subject to judicial review.

It is difficult to decide at this point of the action whether the record as filed is complete. However, a preliminary study of the administrative record reveals formal findings were made by the DOE. Moreover, I rule that Quincy has failed to show that the record as delineated above is not complete or that there may be data or other information relied upon by the decisionmaker and excluded from the administrative record. *Cf. Natural Resources Defense Council, Inc. v. Train*, 171 U.S.App.D.C. 151, 155–156, 519 F.2d 287, 291–92 (1975) (plaintiffs' affidavit made substantial showing that the Administration had not filed the entire record with the court and administrator never claimed that he had filed the entire record). Accordingly, I rule the record as filed and supplemented by the information under the protective order constitutes the full administrative record. Of course, if, after full briefing on the merits, it is established that the record is inadequate or that the agency's fact-finding procedures were deficient, then the matter may be remanded for proceedings which will cure the defect. Accordingly, an order shall enter denying Quincy's motion to compel a more complete administrative record.

Turning next to Quincy's motion to compel production of documents, I note that I am governed by the foregoing. Quincy states that it deposed a Mr. Perry, whose testimony revealed certain blatant errors of the FEA in the calculation of Quincy's maximum allowable selling prices, *e. g.*, the FEA improperly used a cost of goods sold standard in calculating the amount of increased costs which Quincy could include in its maximum allowable selling prices. Quincy argues that it should be allowed to discover if other such errors exist.

■ In making this argument, Quincy ignores the role of this Court in reviewing the administrative record. In suits involving judicial review of administrative action, review is limited to an examination of the administrative record which confronted the decisionmaker at the time he acted, and the Court "is not empowered to substitute its judgment for that of the agency." *Citizens to Preserve Overton Park v. Volpe, supra* 401 U.S. at 416, 91 S.Ct. at 824. If the administrative record supports the agency's action, this Court's function ends. If the agency's decision is not sustainable on the

record, then the decision must be vacated and remanded. *Camp v. Pitts*, 411 U.S. 138, 143, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973); *South Terminal Corp. v. Environmental Protection Agency, supra* at 665. Barring bad faith or improper conduct on the part of the agency, which Quincy has failed to show, discovery outside the record will not be afforded. *Citizens to Preserve Overton Park v. Volpe, supra* 401 U.S. at 420, 91 S.Ct. 814; *United States v. Morgan*, 313 U.S. 409, 422, 61 S.Ct. 999, 85 L.Ed. 1429 (1941); *South Terminal v. EPA*, 504 F.2d 646, 675 (1st Cir. 1974).[3]

If there were errors in the calculations, as Quincy now asserts, it was incumbent on Quincy to present its objection at the administrative level. "[W]hen the question is one which the Agency may never have fully confronted and which may deserve further input both from Agency and outside sources, only a remand for further hearings and an extended record seems adequate." *South Terminal Corp. v. EPA, supra.* For the foregoing reasons, an order should enter denying plaintiff's motion to produce documents not actually employed by the decisionmaker who issued the final orders. *See A. O. Smith v. Federal Trade Commission, supra* at 1013 n. 39.

In its challenge to Ruling 1977–5, Quincy claims that Ruling 1977–5 is inconsistent with the intent and meaning of the petroleum price regulations. On such questions, a court is the final arbiter, but it will consider, and often defer to, an agency's construction of a regulatory scheme which the agency is charged by Congress to administer. *E. I. DuPont DeNemours & Co. v. Collins*, 432 U.S. 46, 54–55, 97 S.Ct. 2229, 53 L.Ed.2d 100 (1977). In its motion to produce, Quincy seeks to discover various documents as evidence of contemporaneous agency construction and to depose Balutis for the purpose of obtaining the various "transaction" tests relied upon by decisionmakers prior to the adoption of Ruling 1977–5.

DOE seeks a protective order and contends that throughout the relevant period it consistently construed the applicable price regulations as requiring the seller to compute its maximum selling allowable price on the basis of the price actually charged on or before May 15, 1973. DOE argues that this Court must defer to this official interpretation of the regulations as they existed during the relevant period. DOE further argues that informal *ad hoc* views of lower-ranking agency employees whose informal opinions may have been repudiated by the agency in Ruling 1977–5 are not entitled to any deference as a proper construction of the regulations.

▮ In making that argument, DOE ignores a crucial factor, that is, it seeks to retroactively apply a ruling that was not adopted until after the relevant period in this case. It is a well-settled principle that the weight afforded an agency's interpretation depends upon "the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all of those factors which give it power to persuade, if lacking power to control." *Skidmore v. Swift*, 323 U.S. 134, 140, 65 S.Ct. 161, 164, 89 L.Ed. 124 (1944); *Standard Oil Co. v. DOE*, No. 77–90, Slip Op. at 55 (Em.App., Dec. 13, 1978). The rule of deference is not clearly applicable to the FEA's interpretation first announced in March, 1977, after the relevant period. *Standard Oil Co. v. DOE, supra.* Discovery should be afforded Quincy for the purpose of discovering whether FEA pronouncements made during the relevant period are consistent with the interpretation set forth in Ruling 1977–5. *Getty Oil Co. v. DOE*, No. 77–434 (D.Del. 1978).

A recent decision, *Gulf v. Schlesinger*, 465 F.Supp. 913 (E.D.Penn.1979), is instructive in that it also involves a challenge to Ruling 1977–5. In ruling on some discovery motions, the court stated that no contemporaneous administrative explanation of the petroleum price regulations exists. Finding the situation it had before it similar to that present in *Citizens to Preserve Overton Park v. Volpe, supra*, the District Court

---

**3.** I reject as legally incorrect the magistrate's finding of bad faith on the part of the DOE based on DOE's refusal to produce documents during this litigation.

authorized the taking of testimony of the "agency officials responsible for formulating and interpreting the regulations at issue." *Gulf v. Schlesinger, supra.*

Plaintiff in the instant case seeks to obtain less authoritative statements than those in *Gulf v. Schlesinger.* On this point, two other cases are instructive. In *Standard Oil v. DOE, supra,* the Emergency Appeals Court reviewed the validity of FEA's interpretation of the meaning of regulations governing refiner passthrough of increased costs, and, in so doing, concluded "that the statements by the FEA auditors and other lower officials are entitled to weight in determining the thoroughness of the FEA's consideration of its regulations, the validity of its reasoning, and its consistency with earlier and later pronouncements." In *California Molasses Co. v. California & Hawaiian Sugar Co.,* 551 F.2d 1230, 1235, 1239 (Emp.App.1977), the Court considered the interpretation of agents of the IRS, who had been charged with enforcing price controls.

On the basis of the foregoing, an Order shall be entered allowing discovery to the extent Quincy seeks to obtain contemporaneous construction of the petroleum price regulations for the relevant period.